IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

LOUIS HAMILTON, et al.,                :        Civil Action No. 69-2443
                                                 & Consolidated Cases
                        Plaintiffs,    :        Section LLM (5)

            v.                         :

ERNEST N. MORIAL, et al.,        :

                        Defendants.    :

------------------------------------------------------ :

### PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER TO PRESERVE EVIDENCE AND TO PERMIT PLAINTIFFS TO ENTER AND INSPECT THE ORLEANS PARISH PRISON

Plaintiffs hereby move the Court for a Temporary Restraining Order prohibiting the

Defendants, or any agent or person(s), from altering the condition of the Orleans Parish Prison, other

than at the House of Detention, until such time as the Plaintiffs may enter and inspect the OPP

facilities, pursuant to provision G.2. of the Environmental Conditions Consent Decree, entered

January 14, 1994, and Fed. R. Civ. P. 34. The grounds for Plaintiffs' Motion are set forth in the

accompanying memorandum.

Respectfully submitted,

Eric Balaban
Elizabeth Alexander
National Prison Project
ACLU Foundation
915 15th St, NW, Seventh Floor
Washington, D.C. 20005
202/393-4930

___ Fee_____
___ Process_____
_X_ Dktd_____
_√_ CtRmDep_____
___ Doc. No._____

William P. Quigley
Loyola Law Clinic
P.O. Box 902
7214 St. Charles Avenue
New Orleans, Louisiana  70118
504/861-5590
Bar Roll #7769

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA


LOUIS HAMILTON, et al.,                    :          Civil Action No. 69-2443
                                                          & Consolidated Cases
                              Plaintiffs,    :          Section LLM (5)


              v.                             :


ERNEST N. MORIAL, et al.,                   :


                              Defendants.    :


------------------------------------------------------ :


## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER TO PRESERVE EVIDENCE AND TO ENTER AND INSPECT ORLEANS PARISH PRISON

### INTRODUCTION

On Monday, August 29, 2005 Hurricane Katrina struck New Orleans. By Friday, September

2, 2004, the 6500 prisoners housed at the Orleans Parish Prison (OPP) had been evacuated from the

jail to some 35 correctional facilities throughout the state.  According to prisoners and staff, OPP

fell into disorder in the five interceding days. See generally Plaintiffs' Memorandum in Support of

Motion for an Injunction for Access to Their Clients (filed Sept. 28, 2005) at 1-6. As the water rose

in the OPP buildings, deputies left their posts wholesale, leaving behind prisoners in locked cells.

Prisoners broke windows and either leapt out or set fire to pieces of clothing and held them outside

the windows to signal to rescuers. The prisoners inside spent days without power, food or water,

some standing in sewage-tainted water up to their chests. Deputies claim that they knew of no

evacuation plan, even though they report that the jail had been emptied out in a flood during the

1990's. The dwindling security staff, depleted by massive job walk-offs by deputies, was forced to maintain order and improvise an evacuation without sufficient manpower, weapons, equipment, or vehicles.

Plaintiffs have filed with this motion accounts by two former OPP prisoners. One prisoner was sprayed with mace and abandoned by officers in a locked cell with seven other prisoners. See Ex. A, Declaration of Eric Balaban, filed herewith (Declaration of Raphael Schwarz). They remained in this cell--without light, food, water, or ventilation--for three days. Id. ¶¶ 1-6. They began waving their orange prison uniform tops out of their broken cell window to signal helicopters they heard pass overhead. Id. ¶ 3. For two days, they worked in shifts to chisel open the frame of their cell window so they could kick the frame out and climb out of the building. Id. They were rescued by a deputy, who told them that she had found three dead bodies in the jail as she was searching for survivors. Id. ¶ 4.

The other prisoner was abandoned by officers for days in two separate facilities. See Ex. B, Balaban Decl. (Declaration of Quantonio Williams). When his unit began to fill with water, he was moved with other prisoners to a basketball court in another building, where he remained for several days. Id. ¶ 6. Without food, water, light, or ventilation, the prisoners then set upon carving a hole in a wall of the basketball court with a broken piece of the basketball rim. Eventually the prisoners were able to chisel out a small hole that smaller prisoners were able to squeeze through to escape. Id. ¶ 8 Other prisoners tied bed sheets together to climb out of broken windows. Id. ¶ 10. Prisoners who did try to escape the building apparently were shot at by officers. Id. ¶ 9.

After the evacuation was completed, the OPP buildings showed signs of the chaos that had taken place inside: ropes and blankets were left hanging out of broken windows, the buildings were

scarred with scorch marks from fires, and "[n]ext to one jail cell window, taped to the outside of the building, [was] a sign scrawled by an inmate, "'We Need Help.'" <u>See</u>  Ex. A, Declaration of Eric Balaban (filed September 28, 2005) (Michael Perlstein, <u>Prison Became Island of Fear and Frustration,</u> New Orleans Times-Picayune, Sept. 23, 2005, <u>available at</u> www.nola.com/weblogs/print.ssf?/mtlogs/nola_tporleans/archives/print082074.html), at 1.

By September 27, 2005, the rope blankets and the signs pleading for help that had been visible outside the OPP buildings some four days earlier had been removed. <u>See</u> Ex. C, Balaban Decl. (Declaration of Katie Schwartzmann) ¶ 3. On September 29, 2005, Plaintiffs served the Sheriff's counsel with a Petition to Enter and Inspect OPP, in order to record the conditions inside the OPP facilities before the Sheriff began clean-up efforts in earnest. <u>See</u> Balaban Decl.¶ 2. The petition was premised on provision G.2. of the Environmental Conditions Consent Decree, entered January 14, 1994, and on Fed. R. Civ. P. 34. That day, undersigned counsel spoke with the Sheriff's attorney, John Weeks, and described the Petition to him. <u>See id.</u> Mr. Weeks asked counsel to send the Petition to him by e-mail, and told counsel he would get back to him with the Sheriff's response. <u>Id.</u> On Monday, October 3, 2005, counsel received a report that there appeared to be increased activity over the weekend by the Sheriff's department around the OPP complex. <u>Id.</u>, Ex. C ¶ 4. Undersigned counsel called Mr. Weeks that day. <u>Id.</u> Mr. Weeks told him that he had not received the Petition, provided counsel with his address so the Petition could be sent to him by Federal Express, and told him that he could not speak with him about the Petition that day since he was working to close his office for the next six weeks. Balaban Decl. ¶ 2. Yesterday, counsel again spoke with Mr. Weeks, who told him that he had not had the chance to read the petition. Mr. Weeks

3

confirmed that the Sheriff planned to re-open the House of Detention in two weeks. Id.[1]  Counsel told Mr. Weeks that Plaintiffs would file a motion with the Court by the end of today for access to OPP to inspect and record the conditions there if Mr. Weeks did not call him back and tell him that the inspection could go forward as planned. Id.

### ARGUMENT

Plaintiffs by this Motion seek to record the conditions inside the buildings of the OPP Complex. They have asked for immediate relief, since this physical evidence likely will be lost or destroyed as the Sheriff makes repairs at the jail to ready it to be re-opened. The Sheriff has stated that he intends to re-open one building at OPP–the House of Detention–in the next two weeks. Plaintiffs do not want to disrupt the Sheriff's efforts, and have therefore excluded that facility from their Motion. They have also crafted their request to allow the Sheriff to repair hazardous conditions at any facility, so long as that repair work is documented.

To obtain preliminary injunctive relief, the moving party must show that (1) there is a substantial likelihood they would succeed on the merits; (2) they face a substantial threat of irreparable harm without the injunction; (3) the threatened injury exceeds any harm the injunction might cause the opponent; and (4) the injunction will not disserve the public interest. See United Offshore Co. v. Southern Deepwater Pipeline Co., 899 F.2d 405, 407-08 (5th Cir. 1990). As shown below, Plaintiffs satisfy this test.

---

1   In fact, the Sheriff has committed to rebuilding and re-occupying the jail as quickly as possible. See Cazenave v. Foti, Civil Action 2000-1246 (E.D. La. Sept 16, 2005) (Motion for Authority to Temporarily Withdraw Settlement Funds) ¶¶ 3-7 (sheriff requests return of escrowed settlement funds to rebuild OPP and pay staff salaries).

I.    **There is a Substantial Likelihood that Plaintiffs are Entitled to Enter and Inspect OPP Under the Environmental Consent Decree and Fed. R. Civ. P. 34.**

Plaintiffs are entitled to enter and inspect the buildings of the OPP Complex under provision G.2. of the Environmental Conditions Consent Decree, entered January 14, 1994. That provision allows Plaintiffs to petition for an inspection of the OPP on ten days notice to Defendants. Plaintiffs provided the Sheriff's counsel with ten days notice of their intention to inspect the OPP facilities, but the Sheriff through his counsel has failed to confirm that Plaintiffs will be given access to the jail. Plaintiffs therefore have had to file this motion.

The environmental consent decree requires the Defendants to comply with the state's fire code, which adopts by reference the National Fire Prevention Code and the Life Safety Code, published by the National Fire Protection Association (NFPA). See La.Rev.Stat. §. 40:1578.7.A., La. Admin Code tit. 55, § 103. Under both codes, Defendants must adopt and implement an evacuation plan for OPP, have 24-hour staffing of all areas where prisoners are housed, unlock all cells and doors necessary for an evacuation within two minutes of an alarm, provide copies of the evacuation plan to jail personnel, and train and drill personnel in executing the plan. See, e.g., NFPA 1 § 15-2.1.3 (1997), NFPA 101 §23.7.1.3 (2003).

Even the limited news reports on the conditions at OPP after the storm suggest that Defendants' failure to devise and implement an evacuation plan left thousands stranded at the jail for days, and may have resulted in prisoners being left to drown in locked cells. Plaintiffs want to enter and inspect the OPP buildings to record their condition before the Sheriff cleans up the facilities as part of his efforts to re-open the jail. The physical evidence inside the jail may support the staff and prisoner accounts that prisoners were abandoned by deputies at the jail, that they were forced to attempt to escape the jail through broken windows and carved-out holes, that they were left

5

in the jail without food or water, that some prisoners broke into control cages in order to open locked cell doors, and that they set signal fires to alert people outside the OPP complex that they had been left behind.   Plaintiffs are entitled to gather  this evidence as part of their efforts to determine if Defendants have failed to comply with the environmental decree.

Plaintiffs would be entitled to enter and inspect the OPP buildings even if the evidence they could gather would not clearly demonstrate a violation of the decree. The language of the inspection provision is unqualified.  It provides, "Plaintiffs' counsel can petition for inspection of the [OPP] facilities on ten days' written notice."  See Hamilton v. Morial, Civil Action No. 69-2443 (E.D. La. Jan. 14, 1994) (Order Approving Consent Decree) at 11.  It does not require Plaintiffs to show that there is some connection between the inspection and an alleged violation of the consent decree. Plaintiffs also retain the right to seek to modify the decree by motion.  See id. at 4. The evidence that Plaintiffs gather during their inspection may point to operational problems in OPP that are not addressed by the existing decree that would warrant modification.

Plaintiffs are also entitled to enter and inspect the OPP complex under Fed. R. Civ. P. 34(a)(2).  That rule permits a party to enter a designated property of another party "for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property, or any designated object or operation thereon, within the scope of Rule 26(b)."  As the Rule indicates, the scope of a request to enter property is limited only by the broad scope of discovery permitted by Fed. R. Civ. P. 26(b).  Therefore, the evidence gathered during the inspection "need not be admissible at trial in order to warrant discovery."  7 James Moore, Moore's Federal Practice, §34.15, at 34-83 (3d ed. 2000).

The cases are legion that the discovery rules should be broadly construed to serve the truth-

finding function of the federal courts.  As the Supreme Court said over a half-century ago:

> We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment.  No longer can the time-honored cry of "fishing expedition" serve to preclude a party from inquiring into the facts underlying his opponent's case.  Mutual knowledge of all of the relevant facts gathered by both parties is essential to proper litigation.  To that end, either party may compel the other to disgorge whatever facts he has in his possession.

Hickman v. Taylor, 329 U.S. 495, 507-08 (1947).  Court-ordered entry on land for a variety of discovery purposes under Rule 34 is common, particularly in cases such as this one involving institutional reform.  See, e.g., United States v. Michigan, 134 F.3d 745, 747-48 (6th Cir. 1998) (district court granted plaintiffs' motion for access to prison facilities, staff, and documents; appeal dismissed for lack of jurisdiction); New York State Ass'n for Retarded Children v. Carey, 706 F.2d 956, 960-61 (2d Cir. 1983) (entry to state mental health facility in proceeding alleging non-compliance with a consent decree); N.O. v. Callahan, 110 F.R.D. 637, 640 (D. Mass. 1986) (inspection of mental health facility in civil rights action brought by patients); Morales v. Turman, 59 F.R.D. 157, 159 (E.D. Tex. 1972) (court granted plaintiffs' request that experts reside in a juvenile facility for 30 days to conduct a participant study of conditions).

The Second Circuit's Carey decision, supra, is the leading authority on this issue.  In a class action suit by patients at a state mental hospital, plaintiffs filed motions to declare the defendants in noncompliance with a prior consent judgment and to appoint a special master.  The defendants, on appeal, challenged a discovery order that permitted plaintiffs' counsel, consultants, and experts to inspect the premises, "take photographs, make observations, take notes, form conclusions and interview any class member of employee desired outside the presence of defendants, their counsel and representatives." Casey, 706 F.2d at 960.  The Court of Appeals upheld the order, observing that discovery would help resolve the parties' dispute over defendants' compliance with the decree, and

7

the burden of disruption to the defendants' operations was outweighed by the gains to be derived from the inspection. Id. at 961.

The inspection upheld in Carey resembles the placement of experts within the Texas Youth Council facilities permitted in Morales v. Turman, supra. There, in an action alleging that operations at two juvenile facilities were unconstitutional, the defendants were required to allow plaintiffs' experts to conduct a 30-day study of the institutions. After considering the defendants' objections that the study would be unduly dangerous and disruptive, the court held the experts could move freely within the institutions, live in the dormitories with the inmates, move from one dormitory to another, attend classes and programs, speak with residents and staff as they saw fit, and enter and observe special treatment centers and lock-down units. Morales, 59 F.R.D. at 157. When the case went to judgment several years later, the judge observed, "their [plaintiffs' experts] perceptions, so much sharper than the untrained visitor, were of invaluable assistance to the Court, and form the basis of many of the Court's findings." Morales v. Turman, 383 F. Supp. 53, 73 (E.D. Tex. 1974).

Plaintiffs seek to preserve evidence with a far less invasive inspection than those approved in Carey and Turman. Here, unlike those two cases, Plaintiffs seek to inspect facilities that remain closed, so the inspection will have little or no effect on the Sheriff's operations. The inspection would not disrupt the Sheriff's ongoing work to re-open HOD, as Plaintiffs have excluded that facility from their motion. The motion also allows the Sheriff to make repairs at any facility of particularly hazardous conditions, as long as he documents his work. Plaintiffs here seek to gather physical evidence based on specific allegations and reports regrading conditions inside the jail after the hurricane. Plaintiffs are entitled to preserve this evidence under Rule 34 given that this evidence likely will be lost absent an immediate inspection.

## II.    Plaintiffs Would Suffer Irreparable Harm if They are Denied the Right to Inspect the OPP.

Plainly, the harm Plaintiffs will suffer were they to lose key physical evidence is irreparable. All of the evidence Plaintiffs seek –broken windows, cell doors taken of hinges and tracks, broken security doors and control offices, scorch marks from fires--will have to be repaired before the Sheriff re-opens and re-occupies OPP. There has been a significant increase in the activity by the Sheriff's department around the OPP complex since Plaintiffs notified the Sheriff's counsel last week that they had filed a petition to enter and inspect the jail. Already, rope blankets and help signs that were visible to reporters outside of OPP buildings as of September 23rd apparently have been removed. Plaintiffs have the right to preserve and record the condition of the OPP building before more of this physical evidence is lost.

It is well-settled that parties have a duty to preserve discoverable evidence relevant to pending, imminent, or reasonably foreseeable litigation. See, e.g., Shepherd v. Am. Broadcasting Corp., 62 F.3d 1469, 1481 (D.C. Cir. 1995) ( a party has "an obligation to preserve and to not alter documents it knew or reasonably should have known were relevant to the . . . litigation."); In re Weschler, 121 F. Sup. 2d 404 (D. Del. 2000) (citing cases); Capellupo v. FMC Corp., 126 F.R.D. 545, 551 (D. Minn. 1989) (collecting cases). Although the overwhelming majority of cases address whether sanctions should be imposed after the destruction of evidence, where courts have been apprised in advance of the possible destruction of evidence, their power to issue a restraining order has not been questioned. See, e.g., American Red Cross v. Palm Beach Blood Bank, 143 F.3d 1407, 1412 (11th Cir. 1998) (approving portion of a preliminary injunction barring the defendant from disposing of or destroying material evidence); Comcast of Illinois X, LLC v. Till, 293 F. Supp. 2d

936, 941-42 (E.D. Wisc. 2003) (temporary restraining order issued prohibiting defendant from destroying business records and cable decoders, or hiding assets, in a lawsuit brought by a cable company alleging that the defendant sold illegal cable decoders); Century ML-Cable Corp. v. Conjugal Partnership, 43 F. Supp. 2d 176, 178 (D. Puerto Rico 1998) (default judgment entered against defendant who willfully violated a TRO prohibiting him from destroying evidence). This Court likewise should enter a temporary restraining order so that Plaintiffs can collect all remaining physical evidence at OPP before it is lost or destroyed.

**III.    The Harm Plaintiffs Would Suffer if They are Denied Access to OPP Before the Jail is Repaired Exceeds Any Harm the Sheriff Would Suffer by Allowing Plaintiffs' Inspection.**

The Sheriff has stated that he wants to re-open the House of Detention in two weeks. The Sheriff's counsel has reported that there are no immediate plans or timetable for re-opening the other OPP facilities, and that the Sheriff does not have the funds available to re-install necessary computer and security systems to re-open any building other than HOD. See Balaban Decl. ¶ 2.    Plaintiffs do not want to interfere with the Sheriff's efforts to re-open HOD. Therefore, they have excluded that facility from that portion of their TRO request prohibiting the Sheriff from altering the condition inside all OPP buildings. Given that the other facilities apparently will not be re-opened soon, and that all of the OPP buildings remain empty, Plaintiffs' request that Defendants be prohibited from altering the condition inside the buildings, or requiring them to record any necessary repairs they do make, will have a limited or no impact on the Sheriff's efforts. Certainly, any marginal impact that the requested injunction would have on the Sheriff's operations is far outweighed by the potential loss of evidence Plaintiffs will endure if the injunction is not issued.

10

**IV.    The Public Interest Would Be Served By Allowing Plaintiffs to Gather Evidence In This Civil Rights Case Before that Evidence is Destroyed.**

This class action case has served to protect the constitutional rights of OPP prisoners for over 30 years. During that time, the Court has expanded the definition of the class, allowed complaints to be amended, and approved modifications to the consent decrees to ensure that the prisoners' lives and safety were protected, and that the jail worked within constitutional norms. Plaintiffs by this motion seek to gather any remaining physical evidence that supports the staff and prisoner accounts that describe a complete security and operation breakdown at OPP that endangered the lives of prisoners and staff during and after the hurricane. The public's interest would be served by allowing Plaintiffs to preserve this physical evidence before it is forever lost. The public also has an obvious interest in seeing that the OPP is re-opened as quickly as possible, and that hazardous conditions at any OPP facility are repaired. Therefore, Plaintiffs have carefully crafted this motion to allow the Sheriff to continue his efforts to re-open the House of Detention without interruption, and to allow Defendants to make any repairs at any facility to conditions that are particularly hazardous.

**CONCLUSION**

For the foregoing reasons, Plaintiffs ask that their Motion for a Temporary Restraining Order be granted.

Respectfully submitted,

Eric Balaban
National Prison Project
ACLU Foundation
915 15th St., NW, Seventh Floor
Washington, D.C. 20005

11

202/393-4930

William P. Quigley
Loyola Law Clinic
P.O. Box 902
7214 St. Charles Avenue
New Orleans, Louisiana  70118
504/861-5590
Bar Roll #7769

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

LOUIS HAMILTON, et al.,            :        Civil Action No. 69-2443
                                               & Consolidated Cases
                  Plaintiffs,    :        Section LLM (5)

        v.                        :

ERNEST N. MORIAL, et al.,        :

                  Defendants.   :

-------------------------------------------------- :

## DECLARATION OF ERIC BALABAN

Eric Balaban, pursuant to 28 U.S.C. § 1746, hereby makes the following declaration:

      1.      I am a staff counsel with the National Prison Project of the ACLU, and am one of Plaintiffs' counsel in the above-entitled action. I make this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order to Preserve Evidence and to Permit Plaintiffs to Enter and Inspect the Orleans Parish Prison, filed herewith.

      2.      On September 29, 2005, Plaintiffs served the Sheriff's counsel with a Petition to Enter and Inspect OPP, in order to record the conditions inside the OPP facilities before the Sheriff began clean-up efforts in earnest. That day, I spoke with the Sheriff's attorney, John Weeks, and described the Petition to him. Mr. Weeks asked me to send the Petition to him by e-mail, and told me he would get back to me with the Sheriff's response. Id. On Monday, October 3, 2005, I received a report from Katie Schwartzmann, a staff attorney with the ACLU of Louisiana, that there appeared to be increased activity by the Sheriff's department around the OPP complex over the weekend. I called Mr. Weeks that day. He told me that he had not received the Petition, and gave me his address so the Petition could be sent to him by Federal

Express. I asked him if the Sheriff would provide Plaintiffs with access to the jail beginning on October 10, the date I had set in the Petition. Mr. Weeks told me that he could not speak with me about the Petition that day since he was working to close his office for the next six weeks. On Tuesday, October 4, 2005, I again spoke with Mr. Weeks, who told me that he had not received the Petition. I asked him if the news reports that the Sheriff intend to re-open OPP in two weeks were accurate. He told me that the Sheriff did intend to re-open one OPP building, the House of Detention (HOD). He told me that the HOD was the only building that could be run without having to install new computer and security systems. Mr. Weeks also told me that the Sheriff did not have the funds to re-open any other OPP building, and there was no timetable for when the remainder of the OPP complex would be re-opened. I told Mr. Weeks that Plaintiffs still wanted to enter and inspect the jail to record the conditions inside the jail before physical evidence was destroyed or lost as the Sheriff made repairs. I also told him that Plaintiffs would have to file an emergency motion if I did not hear from him that the Sheriff would permit our inspection by the end of the day, October 5, 2005.

      3.     Attached to this declaration are true and correct copies of the following documents:

          a.     Declaration of Raphael Schwarz,[1] as exhibit A;

          b.     Declaration of Quantonio Williams (unsigned)[2], as exhibit B;

          c.     Declaration of Katie Schwartzmann,,[3] as exhibit C;

---

[1] Plaintiffs shall file the original signed declaration under separate cover.

[2] Plaintiffs shall file the signed declaration under separate cover.

[3] Plaintiffs shall file the original signed declaration under separate cover.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October **5**, 2005.

Eric Balaban

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

LOUIS HAMILTON, et al.,                    :        Civil Action No. 69-2443
                                                    & Consolidated Cases
                          Plaintiffs,      :        Section LLM (5)

          v.

ERNEST N. MORIAL, et al.,                  :

                          Defendants.      :
-------------------------------------------------- :

Raphael Schwarz, pursuant to 28 U.S.C. § 1746, hereby makes the following declaration:

1.        I was detained in New Orleans in August 27, 2005 on a public intoxication charge.

I was brought to central lock-up at the Orleans Parish Prison (OPP) for processing; then I was moved

to Unit B-3 in Templeman III.  There were no empty beds in cells available in that unit, so I slept in

the day room that night.  When I awoke on August 29, 2005, the day room floor was covered in

several inches of water.  The deputies gave prisoners a mop and bucket and told them to clean the

unit's floor, and also announced that we would not be served breakfast that morning.  We also had

not been given food the previous night.  The deputies then left the unit, as well as the control cage

for the unit.  Prisoners used the mop bucket to break the windows in the day room.  Deputies then

re-appeared wearing riot gear and forced prisoners into cells in my unit.  I was forced into a cell on

the upper tier of the unit with seven (7) other prisoners.  The deputies then left the unit and

disappeared from the floor.  Prisoners began popping open their cell doors.  Some prisoners broke

into the control cage, and opened cell doors in the unit.  Our cell door could not be opened.  There

were two other cells on my tier that also could not be opened—one cell held two prisoners, and the

other cell held one prisoner.

2.        Some deputies returned to the unit, and took all of the prisoners who were not locked



down in cells out of the unit. One of the prisoners in my cell began to kick the cell door to get the deputies' attention. Two deputies came to our cell, and told the prisoner to stop kicking the cell door. When the prisoner continued to kick the door, the deputies sprayed two cans of mace into the cell, and left. I was in the back of the cell at the time, and I got mace on my arms. Other prisoners got mace in their eyes and on their faces. They washed the mace out with water from the sink in our cell. Some of us took off the clothing that had been maced and threw it out of the cell. The paint on the cell walls that were hit by mace began to peel off.

3.       I did not see another deputy for the next two days. The power went off in our unit soon after the deputies left. We did not have ventilation. We had nothing to eat or drink for a total of four days. Though our cell had a toilet, all eight prisoners in my cell agreed not to use the toilet in case we could not flush it.   The window in our cell was broken out, and we began waving our orange prison uniform tops every time we heard a helicopter pass overhead, in order to signal that we were still in the jail. We attempted to kick the cell door off of its track. On Tuesday, we broke off the metal top to the property bin that was below one of the bunks, and we used the metal to chisel around the cell window frame in order to kick the frame out and climb out of the building.  We worked in shifts over the next two days.   By the time we were rescued Wednesday night, we had carved around half of the window frame.

4.       On Tuesday, August 30, 2005, I saw flashlights in the hallway outside the unit. We began kicking on our cell door and yelling. Law enforcement officers came to our cell. They had weapons. They told us that they needed a key to open our cell door, and they left. We did not see these officers again. The next day, Wednesday, at around dusk, a female deputy came into the unit with a maintenance man, and another man who had a gun, but no uniform. She told us that she had

2

been told by officers that there was no one left in our building. She told us she came in to investigate only after she saw a prisoner who had jumped from another building on to the roof of Templeman III and had broken his ankles. She and the maintenance man opened our cell door through the control box on our floor. The female deputy told us that she had already found three dead bodies before she got to us during her search of the building.

5.      She then gathered the 11 prisoners on our tier, along with about 14 other prisoners she found on the three other tiers in our unit. We left the Templeman building through water that reached my chest (I am six feet tall). One of the prisoners in our unit was so weak that we had to sling him over a cooler that floated in the water, and pull him along with us. Once we were outside of Templeman, we were put in a pick-up truck in groups of ten, then got on to boats, and were taken to an underpass, and loaded on buses bound for Hunts Correctional Facility.

6.      At Hunts, all of the evacuees eventually were put on a football field. There were many prisoners there who had shanks and weapons, and there were assaults and fights. I did not see an officer on the football field in the three days I spent there. At Hunts, I spoke with fellow OPP evacuees who had been housed at Templeman III during the hurricane. Some of them told me that they attempted to swim out of the building through central lock-up, but were shot at from adjoining buildings. I did hear gunshots before I was rescued. Another prisoner I met at Hunts told me that he had been locked down at the House of Detention. He said that he was found in his locked cell by two deputies. After being removed from his cell, one deputy told him to stand against the wall, while another deputy told him to move. When he began to move, he told me that he was shot with beanbags. He also told me that he was pushed down a flight of stairs by a deputy who told him he was not moving fast enough. He had welts over his back, shoulders, and arms.

3

I declare under penalty of perjury that the foregoing information is true and correct.

Dated: <u>October 4, 2005</u>

Raphael Schwarz

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

LOUIS HAMILTON, et al.,            :      Civil Action No. 69-2443
                                        & Consolidated Cases
                Plaintiffs,    :      Section LLM (5)

        v.                     :

ERNEST N. MORIAL, et al.,        :

                Defendants.  :
------------------------------------------------------

## DECLARATION OF QUANTONIO WILLIAMS

QUANTONIO WILLIAMS, pursuant to 28 U.S.C. § 1746, hereby makes the following declaration under penalty of perjury:

1. On Saturday, August 27, 2005, I was arrested and charged with possession of marijuana.

2. I was taken to the Orleans Parish Prison (OPP).   At the time of my arrest I had with me approximately $700.00.  That money disappeared and has never been returned to me.

3. When I was first imprisoned at OPP, I was imprisoned on the A side of a building that I think was Templeman I.   After I had been there a couple of days, the water started rising in the building . When it reached approximately 2½ feet, the detainees were locked down and the correctional officers left.

4. After the staff left, one detainee was able to open his cell door because he had fixed his door so that it would not lock.  He got through a broken  window to the control area and used the controls to open all the cells in the unit.  Because the cell doors were now unlocked, everyone was able to go to the second level of the tier, out of the water.

1



5. The detainees went to a second area in OPP and tried to help other detainees get out of their cells. They were able to get some of the cell doors open so that these detainees could move to the second tier in that area, but they were not able to open the doors for all of the other detainees.

6. Then the correctional officers came back and moved us to Templeman III. We were put into a basketball court. There was no plumbing, electricity or air circulation available at this location. When we were first in the basketball court, on the second floor, we had no access to water. The staff all left again.

7. After about a day and a half, someone broke glass to get access to a water fountain. We had no food during this entire period and everyone was hungry. People wrote signs and put them in the windows asking for help.

8. Eventually someone suggested using the rim of the basketball hoop as a tool to get out of building to try to be able to breathe and get food and water. It took about twelve hours of various detainees working to try to make a hole out of the building. Eventually the detainees managed to create a hole that was barely large enough for some of the smaller prisoners to wiggle through. Some of the detainees started to escape.

9. About thirty minutes after people started to escape, I heard a shot. Other detainees told me that a detainee had been shot, but I did not see it. Detainees told the staff that we couldn't breathe, and that we needed food and water. The staff went away.

10. Some people tried to escape again. After people would start to escape again, the staff would come back outside. At first, staff tried to keep people from using the hole but eventually staff told us that if we could get out the hole we could do so, and then they would take custody of us. People tied sheets together to go down the wall. Eventually the sheets broke. I believe that some people

2

who got out this way got away, and some were arrested.

11. All told, I was on the basketball court for two days without food, and most of the time without water. Eventually the correctional officers said that they were coming in to get us. When we were told that the correctional officers were coming in to take custody of us, we were afraid because we expected them to beat us, based on the reputation of the OPP correctional officers. We lay down on the floor on our stomachs to try to give them no excuse to beat us. There was a lot a staff from other jails, and as it turned out, we did not get beaten.

12. We were then escorted to the first floor, where we spent about an hour. The flood water on the first floor was almost up to my neck  Around 7:00 a.m. I was taken out of Templeman III to an overpass.

13. On the overpass we were put in rows. The rows in front had flood water coming up to them. The staff who took us told us that we would be given food and water. Although we saw lots of food and bottled water around, we were not given any. We saw the correctional officers drinking the water.

12. The sun was bearing down on us, and it was extremely hot. Three boats were taking ten men at a time from the overpass. They took people from the front row. It took a long time to get to the front row, and lots of people were passing out in the sun. The only way we could keep from burning up was to wet our shirts in the flood water. We sat out in the direct sun all day without food or water.

13. Eventually I was so desperate that I decided to act as if I had passed out, thinking that this would help me move up in the line. I was taken to the front, but all the people who had passed out were just left out in the sun to the side, and not transported. One man in this section started acting out,

3

and the correctional officer just sprayed all the people in the area, including me. I got mace all over my back. Eventually I got back in line.

14. At 5:00 p.m. the boats stopped coming. We were told that we would have to go down from the overpass and climb down scaffolding to the Interstate. We were told that once we got to the Interstate we would get some food and water. We climbed down the scaffolding around 3:00 a.m.

15. When we got down to Interstate 10, we were handcuffed in pairs and we were each given one small paper cup of water but no food. I saw cases and cases of water and boxes of food there.

16. The Interstate was covered with ants, and there was a lot of debris because it looked as if at some earlier point food and water had been distributed to someone. The guy I was cuffed to and I asked a correctional officer if we could eat an apple we found on the ground and he gave us permission. We each ate half.

17. We asked for more water. The correctional officer said that he would check. He later told us that he was not allowed to give us water.

18. We were eventually put on buses and I fell asleep. We were taken to Hunt Correctional Center. When we get there the warden greeted us by saying so you are the people who were left to die. We were promised tents, food and water. We were told that we would stay outside a day or two and live in tents. We were given salami sandwiches the first day.

19. That night we were taken to a football field. There were thousands of displaced detainees and prisoners on that field. I saw a large number of home-made knives, and people making more knives. I saw two prisoners with guns.

20. On the football field we were sleeping on the grass. There was a pipe that we used for drinking water, but no toilets or way to wash up.

4

21.  There was no security on the football field; staff did not interfere with anything that was going on as long as people did not try to get out of the area.  I witnessed stabbings.

22.  On the last of the four days we were held there we were given sandwiches.  Staff first planned to throw the sandwiches over the wall to us, but eventually they made everyone line up and go through the line to a controlled area to get a sandwich.

23.  During this period, buses came to remove prisoners from the area.  There was a lot of confusion.  I was in line attempting to get on a bus but I never got to the front of the line.  During this period I saw two people wrapped in blankets on the field who were not moving during the several hours that I saw them. I assume that these people were dead.

24.  I estimate that the population got down to 800-1000 people.  Then the warden decided to take us into the housing area of the facility.  We were told that we would get mattresses and a shower.  We were stripped and taken to the housing area at Hunt.  While we were naked staff sprayed us with a fire hose to try to make us not so dirty.  We were brought to an outside visiting area, which had a concrete floor.  We were given sandwiches, a toothbrush and toothpaste.  We stayed there that night with no bedding or showers.

25.  The next day we were taken to a gymnasium where we spent the night without any bedding.

26.  The following day we were taken to a dormitory.   There was a water fountain and we got sandwiches.  Eventually we started getting cafeteria food.

27.  At first we were told that the phones were down, although we could hear phones ringing in the institution.  We were forbidden to write letters.

28.  When I was housed in the dormitory, while we were outside for recreation, I saw a man stabbed and left unconscious.  During the entire recreation period, he was just lying on the ground

5

unconscious.   I never saw him again after I went inside back to the dormitory.

29.  Eventually we were allowed to stand in line for one two-minute call after 10:00 p.m. I was very fortunate because I was able to reach my wife.  After a couple of days she was able to get through the procedure to get me released on a $500 bond.  I was released on September 22, 2005.

30.  I suffer from mild congestive heart failure and asthma.  On the street I use my asthma pump twice a day.

31.  After I got to the dormitory I filled out a sick call slip to try to get my asthma pump and medication for my heart condition.  I was never seen in response to my first sick call slip.

32.  Staff told me to fill out another sick call slip.  I filled out a slip and a nurse saw me two days before I left.  She said she would check to see if staff wanted to order my medications.  I never got my medication.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Quantonio Willians

Executed on October \_\_\_, 2005

6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

LOUIS HAMILTON, et al.,                 :        Civil Action No. 69-2443
                                                 & Consolidated Cases
                          Plaintiffs,   :        Section LLM (5)
                v.

ERNEST N. MORIAL, et al.,               :

                          Defendants.   :
----------------------------------------------- :

Katie Schwartzmann, pursuant to 28 U.S.C. § 1746, hereby makes the following declaration:

1.        I am a staff attorney with the ACLU of Louisiana, and I make this declaration in
support of Plaintiffs' Motion for a Temporary Restraining Order, filed herewith in the above-
captioned case.

2.        On September 23, 2005, the New Orleans Times-Picayune published an article that
included prisoner and staff accounts of conditions at OPP during Hurricane Katrina and its aftermath.
The reporter also described what he saw outside the jail, including ropes and blankets that were left
hanging out of broken windows, abandoned rescue boats, buildings scarred with scorch marks from
fires, and "[n]ext to one jail cell window, taped to the outside of the building, a sign scrawled by an
inmate, "'We Need Help.'" See Michael Perlstein, Prison Became Island of Fear and Frustration,
New Orleans Times-Picayune, Sept. 23, 2005, at 1.

3.        On September 27, 2005, I drove around the Orleans Parish Prison (OPP) complex.
I did not see the blankets, ropes, or signs that Mr. Perlstein described. I saw one boat on a trailer on
the frontage road alongside the complex. A number of broken windows had been boarded up at
Conchetta, the women's facility. There were a couple of sheriff's cruisers outside some of the OPP
buildings. I did not see anyone go in or out of the buildings. I did see water being pumped out of

PLAINTIFF'S
EXHIBIT
C

10/05/2005  07:42    2023934931                NPP OF THE ACLU                    PAGE  03

Conchetta.

4.       I returned to the OPP Complex on October 1, 2005. At that time I saw many more

Sheriff's cruisers outside of the OPP buildings than on my previous visit. The cruisers did not have

the telltale water marks that I have seen on vehicles that had been left in New Orleans during the

storm. There was a fair amount of foot traffic and activity around the jail. I also saw a person

driving a forklift near one of the jail buildings. A barrier blocking what I believe is Tulane Avenue

had also been installed.

       I declare under penalty of perjury that the foregoing is true and correct.

Dated: _October 5, 2005_

_K. Schwartz_

Katie Schwartzmann

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

LOUIS HAMILTON, et al.,                   :        Civil Action No. 69-2443
                                                   & Consolidated Cases
                                Plaintiffs,    :        Section LLM (5)

            v.                                :

ERNEST N. MORIAL, et al.,          :

                    Defendants.    :

---------------------------------------------------- :

### CERTIFICATE OF COUNSEL

Pursuant to Local Rule 37.1, Plaintiffs state that counsel for the Plaintiffs and for the Sheriff

have conferred by telephone for purposes of amicably resolving the issues raised in the

accompanying Motion for a Temporary Restraining Order and have been unable to resolve their

dispute.

Respectfully Submitted,

Eric Balaban
Elizabeth Alexander
National Prison Project
ACLU Foundation
915 15th St, NW, Seventh Floor
Washington, D.C. 20005
202/393-4930

William P. Quigley
Loyola Law Clinic
P.O. Box 902

7214 St. Charles Avenue
New Orleans, Louisiana  70118
504/861-5590
Bar Roll #7769

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

LOUIS HAMILTON, et al.,                :        Civil Action No. 69-2443
                                                & Consolidated Cases
                              Plaintiffs,    :        Section LLM (5)

              v.                              :

ERNEST N. MORIAL, et al.,            :

                              Defendants.    :

------------------------------------------------------ :

## ORDER

For good cause shown, Plaintiffs' Motion for a Temporary Restraining Order is GRANTED; and it is hereby ORDERED that Plaintiffs shall be permitted to enter and inspect the Orleans Parish Prison facilities beginning on _____ to photograph and otherwise record the physical condition inside the facilities.  It is also ORDERED that Defendants shall not alter the physical condition inside the OPP buildings except the House of Detention, or where the conditions inside a building pose a hazard that is an imminent threat to the lives and safety of all persons who conduct an inspection or work in the facility.  Defendants shall document all repairs performed at OPP, and retain that documentation.

Baton Rouge, Louisiana this _____ day of _____, 2005

_____

ALMA CHASEZ
UNITED STATES MAGISTRATE JUDGE

___ Fee_____
___ Process_____
_X_ Dktd_____
_V_ CtRmDep_____
___ Doc. No._____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA


LOUIS HAMILTON, et al.,                :        Civil Action No. 69-2443
                                                 & Consolidated Cases
                        Plaintiffs,     :        Section LLM (5)

            v.                          :

ERNEST N. MORIAL, et al.,               :

                        Defendants.     :

------------------------------------------------------- :

### CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiffs' Motion for a Temporary Restraining Order to Preserve Evidence and to Permit Plaintiffs to Enter and Inspect the Orleans Parish Prison, accompanying Memorandum, declaration and exhibits, and proposed Order, were sent by Federal Express, electronic mail, or by facsimile copy (where noted), to the following counsel for Defendants:



**Patricia Nalley Bowers, Esq. via facsimile copy**
1200 S. Acadia Thruway
Baton Rouge, LA 70806
Phone: (225) 346-5383 (Baton Rouge office)
        (225) 346-5318 (fax)
        (504) 228-4739 (cell)
Email: bowersfirm@hotmail.com

**Harry Rosenberg, Esq. via facsimile copy**
Phelps Dunbar, LLP
City Plaza
445 North Blvd., Suite 701

Baton Rouge, LA 70802
Phone: (225) 346-0285
      (225) 381-9197 (fax)
Email: rosenbeh@phelps.com

**John Weeks, Esq. via Federal Express**
Usry Weeks & Matthews
142 Ridgewood Drive
Metairie, La 70005
Email: weeks142@hotmail.com